## Jackson et al. v. Bolt.
### Nov. 17, 1942.

J. C. Baker, J. B. Carter and Astor Hogg for appellant.

J. B. Snyder, E. H. Johnson, J. L. Williams and George R. Pope for appellee.

OPINION OF THE COURT BY JUDGE REES—Affirming.

On March 28, 1942, a local option election was held in Harlan county and, after certain procedure had been taken in the courts relative to the counting and certification of the votes, the election commissioners certified that 8,888 votes were cast against the adoption of local option and 8,244 votes were cast in favor of local option, or a majority of 644 votes against the proposal. Within the time provided by law, W. J. Bolt filed a contest proceeding against the election commissioners. He alleged in his petition that gross frauds had been committed by the election officers in eleven precincts, and he asked that the votes in each of these precincts be eliminated and that it be declared that a majority of the legal

votes cast in the election were cast in favor of local option. Two answers were filed, one by W. A. Jackson, one of the original defendants, and one by Albert Debusk and T. J. Johnson, who intervened and filed a joint answer. The two answers presented the same defense. The first paragraph of each answer was a traverse of all the material allegations contained in the petition. In the second, third, and fourth paragraphs grounds of counter contest were set up. In the second paragraph violations of the secrecy of the ballot in seven voting precincts were alleged, and it was sought to have the entire vote from each of these precincts eliminated from the returns of the election. In the third paragraph it was alleged, first, that there were 388 registered and legally qualified voters in Pansy precinct No. 53A, but that no vote was cast in this precinct because the ballot box and ballots were wrongfully taken and confiscated by some person or persons, to the defendants unknown, before the voting opened on election morning; and, second, that in High Splint precinct No. 12 there were 726 registered and legally qualified voters, in Baxter precinct No. 15 there were 868 registered and legally qualified voters, and in Kentucky King precinct No. 28 there were 284 registered and legally qualified voters, but that on the morning of the election, and before numerous persons in each of said precincts had voted, the sheriff took the ballot boxes and did not return them to the precincts thereby disfranchising "practically all" of the registered voters in these precincts. In the fourth paragraph it was alleged that a majority of the legal votes cast in the election were cast against local option, but if the court should find that a majority of the votes cast at the election were in favor of adopting local option then the election was void for two reasons: (1) The order of the county judge calling the election was not made or entered at a regular term of the Harlan county court, but was entered on January 12, 1942, long after the regular January term, 1942, had expired; and (2) the election was not advertised as required by law in that no notices were posted in fifteen named precincts, and only one notice was posted in each of the remaining sixty-six precincts. A motion to strike paragraphs 2, 3, and 4 of the answers was filed, but the court did not rule on the motion until the contestant had concluded the taking of his testimony. In the meantime a reply was filed. The first, second, and third paragraphs of the reply traversed the affirmative

allegations in paragraphs 2, 3, and 4 of the answers. The fourth paragraph of the reply pleaded estoppel as to the matters set up in paragraph 3 of the answers. It was alleged that the fraud referred to in that paragraph was committed by the supporters and partisans of the forces opposed to the adoption of the Local Option Law and by the election officers representing those forces. A large amount of proof was taken. Appellee confined his proof concerning fraud to four precincts; Verda No. 7B, High Splint No. 12, Baxter No. 15, and Clover Town No. 58. At the conclusion of his evidence he moved the court for permission to withdraw all allegations of fraud contained in the petition as to the other seven precincts, and the motion was sustained.

The evidence shows conclusively that the grossest kinds of frauds were committed in the four precincts selected for attack by appellee, and that they were committed by the election officers selected to represent the forces opposed to the adoption of the Local Option Law referred to in the record as the "wet" forces. Appellants did not introduce any evidence in contradiction of the charges of fraud in these four precincts, and they candidly concede that the votes certified therefrom, except 6 from High Splint No. 12 and 15 from Baxter No. 15, were properly eliminated by the court. In a written opinion the trial judge said:

"This record discloses the grossest fraud in the conduct of the purported election in Baxter Precinct, No. 15, Clover Town, No. 58, High Splint, No. 12 and Verda, No. 7B. The methods employed by the perpetrators of the fraud were as bold as they were clumsy, and do not possess even the charm of novelty nor the virtue of originality."

After reading the record we are in complete accord with that statement. In the four precincts referred to there were approximately 1,750 legal voters. When the boxes were opened and the ballots contained therein were counted it was found that there were in the four boxes a total of 2,056 ballots, 2,051 marked "No," 2 marked "Yes," and three spoiled. In each of the precincts the election boxes and materials were delivered to an officer representing the forces opposed to the adoption of local option. The frauds committed in the four precincts were somewhat similar. As an example of the methods employed, it is only necessary to refer to

the evidence introduced in regard to Verda No. 7B. None of the ballot boxes and none of the election officers representing the forces opposed to the adoption of local option appeared at the designated voting place, and though an extensive search was made throughout the day no ballot box and no election officer representing the wet forces was found or located and no person in the precinct was able to cast his vote. After the time for closing the polls had passed, the ballot box was returned to the county clerk's office. 718 ballots had been sent to Verda precinct No. 7B. When the ballot box was opened it was found that all of the ballots had been removed from the books. Four were not found, but the other 714 were in the box, 713 marked ''No,'' none marked ''Yes,'' and one spoiled. Likewise, no vote was actually cast by registered voters in Clover Town precinct No. 58. There were only 391 registered voters in the precinct, and only 425 ballots were sent to it, but when the ballot box was opened 739 ballots were found, all marked ''No.'' After the padded vote from the four precincts was eliminated, the majority in favor of local option was 1,388, and the court so adjudged.

After the appellee had introduced his evidence, the court sustained the motion to strike paragraph 2 of the defensive pleadings. The court also struck from paragraph 3 all allegations relative to the failure to hold an election in Pansy precinct No. 53A and to the disfranchisement of all the registered voters therein, and also all allegations with reference to Kentucky King precinct No. 28. There were left in paragraph 3 the allegations as to High Splint and Baxter precincts where it was charged that early in the morning the officers confiscated the ballot boxes and thereby disfranchised a large number of voters in those precincts. At the same time the court overruled the motion to strike paragraph 4 of the defensive pleadings, but later, after proof had been introduced by appellants, struck from paragraph 4 all allegations to the effect that notices of the election had not been posted in numerous precincts as required by law. There was left in paragraph 4 the allegation that the county judge had not called the election during a regular term of the Harlan county court. Appellants now complain of these rulings. In paragraph 2 it was alleged that in seven precincts, to wit, Mary Helen, Elcomb, Twila, North Evarts, South Evarts, Bailey Hill, and Cumberland Avenue, the secrecy of the ballots cast

was not maintained, but that each and every voter voting at the election voted in the open and in the presence of divers persons without such voters having declared upon oath that they were physically or otherwise unable to mark their ballots in secret, and that great numbers of the voters were influenced to vote for local option by persons who were permitted to enter the polls. It was further alleged that the combined majority in these seven precincts for adoption of local option, as certified by the election commissioners, was 1,044 votes, and it was asked that the majorities officially certified from these precincts be deducted from the total vote certified as having been cast in favor of the adoption of local option in Harlan county.

The court correctly struck paragraph 2 of the answer since its allegations were too general. The names of the voters who cast the alleged illegal votes were not given. The purpose of paragraph 2 was to eliminate votes from the total number certified as cast in favor of local option, and it was sought to eliminate them because they were cast openly and therefore were illegal. When such elimination of votes from the number certified forms the grounds of contest, the names of the persons casting the illegal votes must be alleged. Dance v. Anderson, 288 Ky. 431, 156 S. W. (2d) 463; Gross v. Cawood, 270 Ky. 264, 109 S. W. (2d) 597; Hogg v. Caudill, 254 Ky. 409, 71 S. W. (2d) 1020; Humbert v. Heyburn, 240 Ky. 405, 42 S. W. (2d) 538; Combs v. Brock, 240 Ky. 269, 42 S. W. (2d) 323. Appellants contend, however, that this rule does not apply where, as here, it is alleged that every vote in the precinct was cast illegally. The precise question was before this court in Brock v. Williams, 260 Ky. 569, 86 S. W. (2d) 324, 325, and it was said:

"It is strongly urged, however, that, because it is claimed that the entire vote is illegal in these precincts, it was therefore not necessary to set out the names of the voters. Clearly, to uphold such general allegations would be in effect to ignore or nullify the requirements of the statute as heretofore construed by this court."

The same rule is applicable where it is alleged that voters were prevented from casting their ballots, and it follows the court did not err in striking portions of paragraph 3 of the answer. It was alleged that all of the qualified and registered voters of Pansy precinct and

many of the qualified and registered voters of Kentucky King precinct No. 28, High Splint precinct No. 12, and Baxter precinct No. 15 were prevented from casting their ballots. For some reason the court did not strike the allegations as to Baxter and High Splint precincts, but appellants offered no evidence to support their charges concerning them. The appellee already had proved these facts in regard to what occurred in these two precincts; in High Splint precinct the election officers and challenger selected to represent the forces favoring the adoption of local option went to the designated voting place for the purpose of holding the election there, but the election officers representing the forces opposed to the adoption of local option failed to appear. After considerable search they were located at a school house in an isolated spot about one-half mile from the designated voting place. They were in possession of the ballot box and the election materials. All of the ballots had been removed from ballot book No. 2 and 6 ballots had been removed from ballot book No. 1. The ballot box and other election materials were located about 7 a. m. and were taken by the sheriff shortly thereafter. There were 283 ballots in the box, 281 marked "No" and 2 marked "Yes." In the Baxter precinct election officers representing the wet forces were located about 6:30 a. m. in possession of the ballot box and election materials at a point some distance from the designated voting place. All of the ballots from ballot book No. 1 and 15 ballots from ballot book No. 2 had been removed. Ballot book No. 3 was missing. When the box was opened for the counting of the ballots, there were 320 ballots in the box, 318 marked "No," none marked "Yes," and 2 spoiled.

KRS 242.040 (Section 2554c-5, Carroll's Kentucky Statutes) requires the sheriff to advertise a county local option election by written or printed handbills posted at not less than five conspicuous places in each precinct of the county for at least two weeks before the election. The section further provides that "it shall be the duty of the sheriff to report in writing to the county court that the notices have been duly published and posted." In paragraph 4 of the answer it was alleged that the sheriff failed to post the handbills as required by the statute. During the introduction of evidence for the appellee, a deputy sheriff testified that a report stating that the sheriff had advertised the election by posting

at least five printed handbills in every precinct in the county had been filed, but at that time it could not be found in the clerk's office. Later it was found and introduced in evidence by appellants. They produced the report and introduced it in evidence because they were of the opinion that it was defective and contradicted the testimony of the deputy sheriff who had testified as to its contents. The report stated: "Executed by posting notices and advertising in Harlan Daily Enterprise as directed." This was equivalent to stating that the sheriff had posted written or printed handbills at not less than five conspicuous places in each precinct of the county as directed by the order of the county court and required by the statute. After the report of the sheriff was introduced, the court struck that part of paragraph 4 of the answer which alleged that the sheriff had not advertised the election as required by law, and refused to hear further testimony on that issue. This was proper since the appellants had failed to allege that the report was obtained through the fraud of the party benefited or by mistake of the officer making same. KRS 61.060 (Carroll's Kentucky Statutes, Section 3760) reads:

"Unless in a direct proceeding against himself or his sureties, no fact officially stated by an officer in respect of a matter about which he is by law required to make a statement, in writing, either in the form of a certificate, return or otherwise, shall be called in question, except upon the allegation of fraud in the party benefited thereby, or mistake on the part of the officer."

In Hawkins v. Walton, 271 Ky. 487, 112 S. W. (2d) 661, it was held that the provision of the statute directing that the sheriff report in writing to the county court that the notices had been posted is not mandatory. Until it was shown that a report had been made, the pleadings were sufficient to raise the issue as to whether or not the notices had been posted as required by the statute, but when the report was produced it was incumbent upon the appellants to attack it in the manner prescribed by KRS 61.060. The report contained facts "officially stated by an officer in respect of a matter about which he is by law required to make a statement, in writing," and under the statute no fact officially stated by the officer shall be called in question except upon the allegation

of fraud or mistake. Atkins' Guardian v. McCoy, 263 Ky. 846, 93 S. W. (2d) 839; Byers v. First State Bank of Middlesboro, 159 Ky. 135, 166 S. W. 790; Park Hill Realty Co. v. Lykins, 290 Ky. 498, 161 S. W. (2d) 602; Turner v. Howard, 277 Ky. 172, 126 S. W. (2d) 135.

We find no merit in appellants' claim that the order calling the election was not entered by the county judge at or during a regular term of the Harlan county court. The regular term of the county court in Harlan county begins on the first Monday in each month. The petition requesting the county judge to call the local option election was lodged in the county clerk's office on January 5, the first Monday in January, 1942. On January 12, 1942, an order was entered calling the election. As a part of the order this appears: "Harlan county court, State of Kentucky, January term seventh day, 12th day of January, 1942." Many other orders were entered on the order book between January 5th and January 12th and between January 12th and January 31st, but no order adjourning, continuing, or reconvening the court was made until the last order entered on January 31st, which was one adjourning the court until the February term. It is manifest that the Harlan county court was in session continuously from the day it convened the first Monday in January, 1942, until the final order of adjournment on the last day of the month, and it follows that the order calling the election was entered at a regular term of the Harlan county court in compliance with the Local Option Election Law.

Appellants finally insist that the trial court should have held the election void because of the disfranchisement of at least 1,750 voters in Baxter, Clover Town, High Splint, and Verda 7B precincts. This argument places appellants in the anomalous position of asking that an election be held invalid because of frauds committed by their own supporters and representatives. It is admitted that appellants had no part in the frauds, but they and those they represent were the beneficiaries of the frauds and they should not be permitted to take advantage of the lawless acts of their own supporters in order to have the election declared void.

The records of this court reveal a large number of appeals from Harlan county during recent years involving election frauds, many of them as brazen as the frauds disclosed by this record. The average of hon-

esty, integrity, and intelligence of the citizenry of Harlan county is high. The great majority of its population is composed of law-abiding citizens loyal to the democratic processes. If they wish to see those processes survive, they must assert themselves and shackle the small lawless element in their midst. There is little that this court can do to remedy the evil. Where it is shown that election frauds have been committed, it can only deprive the beneficiary of the fruits of victory. This alone will not suppress the nefarious practice. The remedy rests with the patriotic and law-abiding citizens of the county.

The judgment is affirmed.

Whole Court sitting.