Donald C. LYNCH Appellant,

v.

COMMONWEALTH of Kentucky Appellee.

No. 2000–SC–1049–MR.

Supreme Court of Kentucky.

May 16, 2002.

John Palombi, Assistant Public Advocate, Department of Public Advocacy, Frankfort, Counsel for Appellant.

A.B. Chandler III, Attorney General, Dennis W. Shepherd, Office of Attorney General, Criminal Appellant Division, Frankfort, Counsel for Appellee.

GRAVES, Justice.

Appellant, Donald C. Lynch, was convicted in the Pulaski Circuit Court for murder and tampering with physical evidence. He was sentenced to life imprisonment and appeals to this Court as a matter of right. Finding no error, we affirm.

Pertinent facts to this case began more than 20 years ago, when Appellant began

dating his now-estranged wife, Teresa Lynch. Teresa had also known the victim, Steven Dale Richmond, since the sixth grade. Over the next 14 years, she predominantly dated Appellant, but left him in 1994 to date Richmond. Teresa ultimately reunited with Appellant, married him in 1995, and had a son by him in 1996.

According to Teresa's testimony, about a month before she and Appellant married, he began asking her about the extent of her prior relationship with Richmond. The subject arose again, some five years later, when Appellant confronted Teresa at work, accused her of having had sex with Richmond during their past relationship, and demanded a divorce. In response, Teresa moved out of the marital home, and, oddly enough, Richmond moved in with Appellant shortly thereafter. By August 1999, Teresa had filed a petition of dissolution, listing the date Appellant showed up at her job as the date of the couple's physical separation.

About 11:00 p.m. on September 29, 1999, Richmond and his girlfriend returned to the house he was sharing with Appellant. The three watched television until around midnight when Richmond and his girlfriend went to his bedroom. According to the girlfriend's testimony, when she left at approximately 1:30 a.m., Richmond asked her to return the next day and also asked her to call him and let him know that she had arrived home safely. She called that night but did not receive an answer. Since there was no answer the next day at noon when she returned to the house, she left Richmond a note. She returned later, found no one at home, but observed that both of Appellant's cars were in the driveway and that the note was gone.

Appellant initially told police he had no idea of Richmond's whereabouts, but suggested several places where he might have gone. Appellant claimed that Richmond left immediately after his girlfriend on the night in question, and that no one could have entered the house and harmed Richmond anyway, since Appellant slept by the front door on a couch in the living room. Even after Richmond's body was found, Appellant denied any knowledge of his death. Within an hour of discovering Richmond's body, police obtained a warrant to search Appellant's home and discovered that the mattress in Richmond's bedroom was missing.

The day after Richmond's funeral, Teresa met with Appellant to obtain documents pertaining to their pending divorce. Teresa testified that at that time she asked Appellant if he had killed Richmond and he admitted unequivocally that he had. Teresa stated that Appellant told her that he shot Richmond through the eye so that he could never look at Teresa again. Appellant's description of the shooting matched Richmond's wounds.

During a subsequent police interview, Appellant changed his story and claimed that he found Richmond's body in bed with Appellant's rifle lying next to it. Appellant claimed he had loaned Richmond the rifle, which was consistent with the caliber of weapon used in the murder. Explaining that he feared the repercussions of finding a dead man in his home, Appellant admitted taking the body to a recreational area in Scott County, Tennessee and leaving it on a bridge. He told police that he had tried to clean the mattress, but eventually disposed of it because he could not remove the blood stains. He also cleaned the rifle and placed it in his closet.

On the day of his second interview, police issued a warrant for Appellant's arrest. Upon learning of this fact, Appellant shaved and dyed his hair, and fled to California. In addition to murder, Appellant was eventually indicted for tampering with physical evidence and for abuse of a

corpse. The abuse of a corpse charge was dismissed, but the jury recommended a life sentence for the murder and a five-year sentence for tampering with physical evidence, which the court ordered to run concurrently. Additional facts are set forth as necessary.

■ Appellant first argues that the only incriminating evidence against him, Teresa's testimony concerning his confession, should have been barred under the marital privilege. The trial court, however, admitted the statement pursuant to the exception contained in KRE 504(c)(2)(C), which provides that the marital privilege does not apply in any proceeding in which one spouse is charged with wrongful conduct against "an individual residing in the household of either." Finding that Appellant's home was a household and that Richmond was residing there at the time of his murder, the trial court ruled that Teresa's testimony was admissible under KRE 504(c)(2)(C).

There are no prior Kentucky cases interpreting this exception. However, a number of jurisdictions have adopted Rule 504 of the Uniform Rules of Evidence and the exception at URE 504(d)(3) is identical to KRE 504(c)(2)(C). In *State v. Widdison*, 4 P.3d 100, 111–12 (Utah Ct.App. 2000), the exception was used to admit evidence of the defendant's admission to his wife that he had abused his girlfriend's infant child who was then residing in his household; and in *Munson v. State*, 331 Ark. 41, 959 S.W.2d 391, 392 (1998), the exception was used to admit evidence of the defendant's admission to his wife that he had sexually abused the wife's fourteen-year-old sister who was then residing in their household. The exception for cases involving crimes against "a child of either," URE 504(d)(2) and KRE 504(c)(2)(b), could not have been applied in those cases since the victim in neither case was the child "of either" spouse. Nor does KRE 504(c)(2)(C) purport to limit its coverage to child victims; for, if so, it would have been a simple matter to have written the exception to apply to "a child" instead of to "an individual." We conclude that the exception applies in this case if Richmond was residing in Appellant's household at the time the crime was committed.

■ The question necessarily becomes whether the trial court correctly found that Richmond resided in Appellant's household at the time of the murder. Kentucky case law has previously defined residence as a "factual place of abode or living in a particular locality." *Old Reliable Insurance Co. v. Brown*, Ky.App., 558 S.W.2d 190 (1977). Typically, where an individual resides is a question of fact for the jury, however, as this Court stated in *Young v. Commonwealth*, Ky., 50 S.W.3d 148, 167 (2001):

> [W]hen the determination [of admissibility] depends upon the resolution of a preliminary question of fact, the resolution is determined by the trial judge under KRE 104(a) on the basis of a preponderance of the evidence, *Bourjaily v. United States*, 483 U.S. 171, 175, 107 S.Ct. 2775, 2778–79, 97 L.Ed.2d 144 (1987); and the resolution will not be overturned unless clearly erroneous, i.e., unless unsupported by substantial evidence.

There is some dispute whether Richmond lived in various other places while he was playing music throughout Kentucky and Tennessee. However, it is clear that when he was in the Pulaski County area, he lived in Appellant's home and kept his belongings there. Based on the record, we cannot say that the trial court's decision regarding Richmond's residency was clearly erroneous. Thus, Teresa's statements were properly admitted.

Appellant next argues that he was entitled to a mistrial because the jurors must have discussed the case and begun deliberating prematurely to have returned a verdict on his guilt in 29 minutes, and on his sentence in 18 minutes. Appellant relies on what he perceives as a total lack of physical evidence against him. We remain unconvinced. As our predecessor court stated in *Beach v. Commonwealth*, Ky., 246 S.W.2d 587, 589 (1952):

> The fact that the jury returned a verdict in about eight minutes after having the case submitted to them does not indicate to us that Beach did not receive a fair trial when the issues of fact were so clearly drawn. It is true that a verdict should be the result of dispassionate consideration and the jury, if necessary, should deliberate patiently until they reach a proper conclusion concerning the issues submitted to them. Yet where the law does not positively prescribe the length of time a jury shall spend in deliberation, the courts will not apply an arbitrary rule based upon the limits of time.

*Id.* at 589. *See also Smith v. Commonwealth*, Ky., 375 S.W.2d 242 (1964) (Jury returned guilty verdict for murder after 34 minutes) and *De Berry v. Commonwealth*, Ky., 289 S.W.2d 495 (1956), *cert. denied*, 352 U.S. 881, 77 S.Ct. 105, 1 L.Ed.2d 81 (1956) (Jury was out only 20 minutes before murder conviction).

Here, the evidence presented at trial showed that Richmond had been in a previous relationship with Appellant's wife and that Appellant's jealousy on this subject led to their divorce. Appellant thereafter invited Richmond to live with him. After claiming that he found Richmond already dead, Appellant disposed of the body and a bloody mattress, repeatedly lied to investigators, and changed his appearance and fled to California after an arrest warrant was issued. Testimony further established that the last person to see Richmond alive left him alone with Appellant.

A mistrial is an extraordinary remedy and, according to our decision in *Kirkland v. Commonwealth*, Ky., 53 S.W.3d 71, 76 (2001), "[i]n order to grant a mistrial, there must appear on the record a manifest necessity for such an action." Here, we see no such manifest necessity. Jurors had more than enough evidence presented to them to convict Appellant in the amount of time that they did. Absent any evidence of juror misconduct, it is not the duty of this Court to second-guess a jury decision simply because it viewed the evidence as conclusive. Furthermore, with regard to the sentencing phase, only one witness, an employee of the Division of Probation and Parole, testified as to parole eligibility. We find no error in the jury agreeing on a sentence in 18 minutes.

We affirm the judgment and conviction of the Pulaski Circuit Court.

LAMBERT, C.J., COOPER, GRAVES, JOHNSTONE, and WINTERSHEIMER, J.J. concur.

KELLER, J., concurs in part and dissents in part in a separate opinion in which STUMBO, J., joins.

KELLER, Justice, Concurring in Part and Dissenting in Part.

Although I agree with the majority opinion to the extent that I would affirm Appellant's conviction and five (5) year sentence for Tampering With Physical Evidence, I respectfully dissent from the majority's holding as to Appellant's conviction and sentence of life imprisonment for the offense of Murder. In my opinion, both the trial court and today's majority have erroneously interpreted the KRE 504(c)(2)(iii) exception to the husband-wife

privilege for "proceeding[s] in which one (1) spouse is charged with wrongful conduct against the person or property of ... an individual residing *in the household* of either"[1] by essentially deleting the "in the household" language from the exception.[2] While the majority would apply the KRE 504(c)(2)(iii) exception whenever the victim lives under the same roof as the defendant or the defendant's spouse, I believe the exception applies only in proceedings against a defendant for a wrong committed against a member of a social unit or domestic establishment—commonly known as a "household"—in which one (1) or both of the parties to the marriage is a member. Accordingly, and because the trial court in this case relied upon an erroneous interpretation of "household" when it rendered findings of fact as to the existence of the husband-wife privilege, I question whether the trial court properly allowed the Commonwealth to solicit testimony from Appellant's wife concerning inculpatory statements made to her by her husband. Thus, I would vacate Appellant's murder conviction and remand that count of the indictment to the Pulaski Circuit Court for the trial court to re-examine the merits of Appellant's claim of privilege under the properly-construed KRE 504(2)(c)(iii) exception.

To clarify, I do not quibble with the trial court's conclusion that Richmond *resided* with Appellant in a house that Appellant and Teresa Lynch owned in Somerset, Kentucky. That conclusion is supported by substantial evidence.[3] I cannot say the same, however, about the trial court's finding that Richmond *resided in Appellant's household.* The trial court's written and oral findings of fact demonstrate that the court's conclusion that Richmond resided in Appellant's household flowed directly and exclusively from its prior finding that Richmond and Appellant shared a residence.

In the trial court's original order denying Appellant's motion in limine, the court based its conclusion on its belief that, in the context of KRE 504(b)(2)(iii), a "household" was tantamount to a "place of occupancy":

"Household" is defined in Webster's New World Dictionary as "all the persons who live in one house; family and servants." The word also connotes a place, being, according to Webster's Dictionary, "the home and its affairs." Ballentine's Law Dictionary defines household as "persons who dwell together as a family." A definition of household adopted by the Kentucky Court of Appeals in *Sutton v. Shelter Mutual Insurance Company,* Ky.App., 971 S.W.2d 807, is from 1981 New College Edition of the American Heritage Dictionary of the English Language. It defines household as "a domestic establishment including the members of a family and others living under the same roof." It is not essential to constitute a household that the persons living together under the same roof be related by blood or marriage. The definitions refer to persons living together "as a family." The language of the exception itself is important, in that it refers, not to a family member, but to "an individual." *It is also significant to note that the rule does not refer to individuals residing "as members of the household" but it*

**1.** KRE 504(c)(2)(iii) (emphasis added)..

**2.** In fact, the majority opinion does not address the definition of "household" at all and instead defines "residence," a word not found in KRE 504. Majority Opinion at 74 S.W.3d 711, 713 (2002).

**3.** *See* KRE 104; *Talbott v. Commonwealth,* Ky., 968 S.W.2d 76 (1998).

uses the language "in the household". In that context, the word household encompasses its meaning as both a place of occupancy and the persons living therein as a family. In that context, Donald Lynch living alone has a "household." Steven Richmond, taking up residence at Donald Lynch's home is "residing in the household" of Donald Lynch. The Court concludes that the exception to the marital privilege rule is applicable. Therefore, there is no privilege under rule 504 to bar Teresa Lynch from offering testimony about wrongful conduct by Donald Lynch directed against the person or property of Steven Richmond, who was an individual residing in the household of Donald Lynch.

(Emphasis added). On the day the case was called for trial, after Appellant asked the trial court to reconsider its ruling in light of new evidence concerning Richmond's place of residence, the trial court again indicated that it equated Appellant's "household" with the residence he occupied, and that it viewed the inquiry as distinct from whether Richmond was a "member of the household." Later that same day, the trial court again indicated that his findings were premised on the notion that Appellant's "household" was simply the structure in which Appellant lived:

> Whether or not he's part of the household isn't really the inquiry under [Rule 504(c)(2)(iii)]. The question is whether he's residing in the household.... I interpret the word household to include a single person living alone can be a household. They're all the related people in the family and others, including domestic help and others living under that roof, so whether or not Mr. Richmond was a member of the household isn't the inquiry. *The inquiry is whether he was residing in the household of Donald Lynch and in the context of the rule I think that means the same thing as residing at Donald Lynch's house or living in his apartment,* and he had done so long enough to be considered residing there.

(Emphasis added).

I find the trial court's interpretation of "household" erroneous. First, and most important, if "household" is defined simply as a house or apartment or other "place of occupancy," that construction renders the "in the household" language in KRE 504(c)(2)(iii) superfluous. Under the trial court's interpretation, the exception's meaning would be identical if the word "household" was deleted from the provision and the subsection read "residing with either" because any individual residing in another person's house or apartment would, according to this interpretation, necessarily reside in that person's household. As explained in more depth below, however, the terms "house" and "household" are not synonymous. Interpreting KRE 504(c)(2)(iii) in a manner that renders half of it moot violates our rules of construction,[4] and the error is particularly egregious in this case because such a construction would distort the exception's meaning.[5]

Second, as the trial court recognized in its written order, the primary definitions of "household" invariably refer not to structures in which persons live, but instead to the social arrangement of persons

---

**4.** *See GMC v. Book Chevrolet,* Ky., 979 S.W.2d 918, 919 (1998) (recognizing a rule of construction that enactments "should be construed so that no part of it is meaningless or ineffectual.").

**5.** *See* AM. JUR. 2D *Automobile Insurance* § 224 (1997) ("The word 'household' connotes a settled status; a more settled or permanent status is indicated by 'resident of the same household' than would be indicated by 'resident of the same house or apartment.' ").

living together, i.e. "a family living together,"[6] or "[a] family residing together in one dwelling, using common living quarters and facilities under such domestic arrangements and circumstances as create a single family unit or establishment,"[7] or "[a] domestic unit consisting of the members of a family who live together along with nonrelatives such as servants,"[8] or "[t]hose who dwell under the same roof and compose a family."[9] And, the process of determining what persons constitute a "household" requires more than counting the number of pillows where people lay their heads at night. Courts interpreting the term "household" in the context of automobile insurance policy exemptions have held that, while a "household" may consist of either (or both) relatives or nonrelatives, in order to constitute a "household," a collection of persons must live together *as a family:*

> Whether the term "household" or "family" is used, the term embraces a collection of persons as a single group, with one head, living together, a unit of permanent and domestic character, under one roof, that is, a collective body of persons living together within one curtilage, subsisting in common and directing their attention to a common object, the promotion of their mutual interests and social happiness.[10]

And, under federal Medicare statutes, "any person sharing a common abode as part of a single family unit, including domestic employees and others who live together as part of a family unit, is considered a member of a Medicare beneficiary's household .... *Roomers and boarders are not considered household members.*"[11]

Third, KRE 504(c)(2)(iii)'s use of the preposition "in" does not support the trial court's interpretation. This preposition "is used with verbs signifying being, resting, or moving within limits, or within circumstance or conditions of any kind conceived of as limiting, confining, or investing, either wholly or in part. In its different applications, it approaches some of the meanings of, and sometimes is interchangeable with, within, on, at, of, and among."[12] And, although the trial court appears to have believed its inquiry into whether Richmond was "residing in the household" was distinct from the question whether Richmond was a "member" of Appellant's household, the Kentucky Evidence Rules Study Commission's explanation for the policy rationale behind the KRE 504(c)(2) exclusion suggests the trial court misunderstood the inquiry: "The second exception is based on the thought that when the welfare of a *member of the household* is in issue it is inappropriate to recognize a spousal privilege which would deny triers of fact access to relevant evidence."[13] As such, an individual may reside "in" a household defined as a social unit of persons as easily as he or she could

6. BLACK'S LAW DICTIONARY 744 (7th ed.1999).

7. BALLENTINE'S LAW DICTIONARY (3d. ed.1969) (citations omitted).

8. AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed.2000).

9. WEBSTER'S REVISED UNABRIDGED DICTIONARY (1998).

10. 7 AM. JUR. 2D *Automobile Insurance* § 224 (1997).

11. 70C AM. JUR. 2D *Social Security and Medicare* § 2462 (2000) (emphasis added). *See also* 42 C.F.R. § 411.12(b).

12. WEBSTER'S REVISED UNABRIDGED DICTIONARY (1998). I would also observe that one of the illustrations following this definition uses the preposition in the phrase "in his family." *Id.*

13. Kentucky Evidence Rules Study Commission Commentary to KRE 504 (November, 1989) (emphasis added). I would observe that this Commentary suggests that the inter-

reside "in" a household characterized by two-by-fours, drywall, and a roof.

Here, the trial court's conclusion that Richmond resided in Appellant's household was based solely upon the fact that the two (2) men occupied the same residence. The trial court's orders conclusively establish that it gave no consideration to the question of whether the men lived together as a quasi-familial social unit. Unfortunately, even if it were appropriate for this Court to do so, it appears impossible for us, on the basis of the record before us, to undertake an independent determination of the evidence and determine whether Appellant's wife's testimony would have been admissible under a properly-construed KRE 504(c)(2)(iii) exception to the husband-wife privilege. The trial transcript contains no evidence upon which to base a finding that the men lived together as a household—and in fact, the testimony of at least one (1) witness, Detective Nelson, supports the contrary conclusion by describing the men as "roommates." However, Appellant's Designation of Record omitted the evidentiary hearing regarding Appellant's motion in limine conducted by the trial court on July 19, 2000. While the responsibility falls upon Appellant to ensure the completeness of the record,[14] and, ordinarily, "we are required to assume that any evidence in the record not before us supports the findings of the lower court,"[15] here the trial court's written order and statements from the bench demonstrate that his findings of fact followed an erroneous legal conclusion concerning the interpretation of "household" in KRE 504(c)(2)(iii). Because the trial court explicitly avoided the question of whether Richmond was a member of Appellant's household, I can see no basis for this Court to assume that the record would support a finding that the trial court never made.

Accordingly, I would vacate Appellant's conviction and sentence of life imprisonment for the offense of Murder, and remand Count One of Pulaski Circuit Court Indictment # 99–CR–0152 to the trial court for it to determine, under a proper-construction of the KRE 504(c)(2)(iii) exception, whether the KRE 504 husband-wife privilege prevents Appellant's wife from testifying regarding Appellant's inculpatory statements. If the trial court were to again find the exception applicable, I would direct it to reinstate the conviction subject to judicial review of the trial court's findings on that question. If, however, the trial court were to find, upon reexamination, that the testimony comes within the KRE 504 privilege, I would hold that the erroneous introduction of this evidence at Appellant's trial would require a new trial on the charge of Murder with this evidence excluded.

STUMBO, J., joins this opinion, concurring in part and dissenting in part.

---

pretation urged in this dissent is consistent with the narrow purpose for the exclusion. Although the normative bases supporting the husband-wife privilege have been the target of severe criticism, perhaps none as biting as 8 Wigmore, Evidence § 2228 (McNaughton rev. 1961), but the fact remains that KRE 504 establishes a privilege in the husband-wife context. While the temptation to stretch the limits of the KRE 504 exclusions to permit the admission of relevant evidence is difficult. to resist, judicial fiat is an inappropriate mechanism to change our rules regarding privileges.

**14.** *See Commonwealth v. Thompson,* Ky., 697 S.W.2d 143 (1985); *Fanelli v. Commonwealth,* Ky., 423 S.W.2d 255 (1968).

**15.** *Colonial Life & Acc. Ins. Co. v. Weartz,* Ky.App., 636 S.W.2d 891 (1982). *See also Burberry v. Bridges,* Ky., 427 S.W.2d 583 (1968).